BOLIN, Justice.
Shonda Nicole Johnson was convicted of capital murder for the killing of Randy McCullar. The murder was made capital because it arose out of or was related to McCullar’s role as a witness for the State of Alabama before a grand jury in a bigamy prosecution against Johnson. See § 13A-5-40(a)(14), Ala.Code 1975. The jury, by a vote of 11-1, recommended that Johnson be sentenced to death. The trial court followed the recommendation and sentenced Johnson to death. The Court of Criminal Appeals reversed Johnson’s conviction and remanded the case for a new trial on the basis that no limiting instruction had been given on the use by the jury of evidence of Johnson’s prior bad acts. Johnson v. State, 120 So.3d 1100 (Ala.Crim.App.2005). We granted the State’s petition for a writ of certiorari; we reverse the judgment of the Court of Criminal Appeals and remand the case.

Facts and Procedural History

The Court of Criminal Appeals set forth the trial court’s written findings of fact summarizing the crime and Johnson’s participation in it:
“ ‘In the early morning hours of November 30, 1997, David O’Mary, a vice president of First National Bank of Jasper, was traveling down Alabama Highway 195 in Walker County. As he drove past the Harmony Missionary Baptist Church, he noticed what appeared to be a man lying next to a parked car in the church parking lot. He noticed that the man was not moving and pulled into the parking lot to investigate. Upon approaching the person, O’Mary noticed that the man had gray color to his complexion. Upon further investigation, he saw that the man had been shot and was, in fact, dead. He notified the authorities of his discovery.
“ ‘Two nights prior to this discovery, the defendant, Shonda [Nicole] Johnson (Richards), and her codefendant/hus- *1121 band, Tim Richards,[1] were having Thanksgiving dinner at the home of Audrey Gray, the sister of Mr. Richards. At the conclusion of the meal and as they were about to leave, the defendant, Shonda Johnson, stated that she and her husband were going “headhunting” and stated that they had a gun in the back of the car. The defendant, Shonda Johnson, and her husband, Timothy Richards, on an earlier visit, discussed the fact that Randy McCullar (later the victim in this matter) was taking the defendant back to court to get custody of their son, Chad. In the conversation, in the presence of Mrs. Gray, there was some mention of the defendant, Shonda Johnson, being raped by Mr. McCullar. When Mrs. Gray realized that they were serious, she told her brother “not to be stupid.”
“ ‘The Saturday after Thanksgiving, 1997, the defendant and Timothy Richards hired a babysitter and went to the Kooler, a restaurant in Jasper, Alabama. They asked for a menu, but were told that the kitchen was closed. They went back to their apartment in Jasper. After a while they both decided to go to the BC Lounge, a Jasper night spot. [Shonda Johnson] had told Richards that Randy McCullar would leave the lounge at 12:00 to 12:30 A.M. and that would be a good time to get rid of him.
“ “When they arrived at the BC Lounge they spotted [McCullar’s] car. Timothy Richards got out of his car and sliced the tire of McCullar’s car. McCullar came out of the lounge. He appeared to be drunk. He got in his car and drove away from the parking lot. At this point the couple lost McCullar. They drove around Jasper until they found him at the Omelet Shoppe in Jasper. When McCullar left the Omelet Shoppe, they followed him traveling north on Highway 195 toward Double Springs in Winston County.
“ ‘At a point the defendant, Shonda Johnson, saw that McCullar had pulled into a church parking lot. They turned around, went t.o the parking lot of the church, and pulled up to McCullar. Words were exchanged between Johnson and McCullar. Johnson had put shells in the rifle when they were en route following McCullar. As they pulled up to the scene, she “bolted the shells into the chamber.” She then “shoved” the weapon into the hands of Richards. She said, “[D]o it, do it, get it over it.” Richards then point[ed] the gun at the head of McCullar and flre[d] the gun. While backing out of the parking lot, the defendant, Johnson, was laughing and smiling.
“ ‘Johnson and Richards returned to their apartment in Jasper. After a while in the apartment, they both got in the car and drove to Littleton’s bridge near Good Springs, Alabama. Richards threw the rifle off the bridge into the river. They later did the same thing with the gun case at Baker’s Creek, which is located in the same area of the county.
“ ‘They again returned to their apartment[.] Shonda Johnson wanted to have sex, but Richards could not handle it. Richards stayed up all night. Johnson went to sleep.
“‘Prior to her “marriage” to Tim Richards, the defendant had a live-in relationship with Ronnie Webb. This relationship started in September 1996. After about a month into this relation *1122 ship, Randy McCullar took a warrant for [Shonda Johnson] charging her with bigamy. After this occurred, [Shonda Johnson] constantly wanted “somebody to do away with Randy McCullar or have something done with him” according to Webb. At one point in this relationship [Johnson] talked about killing McCullar. She even suggested that Webb get some dynamite and do it right then.’ ”
Johnson, 120 So.3d at 1104-05. Regarding McCullar’s role as a witness before the grand jury on the bigamy charge against Johnson, the Court of Criminal Appeals stated:
“[ 0]n June 24, 1995, Johnson and McCullar participated in a wedding ceremony conducted by the preacher from McCullar’s church. Just before the ceremony, McCullar contacted the preacher and indicated that he was quite upset because he had learned that Johnson’s divorce was not final and would not be final before the wedding ceremony took place. The preacher agreed that the ceremony would be a ‘practice’ ceremony, and he informed McCullar that Johnson and he should come to the preacher’s home after Johnson’s divorce was final to again take the vows and be legally wed. On July 11, 1995, a marriage certificate for McCullar and Johnson was filed in the Winston County Probate Court Clerk’s office. The couple remained together only a matter of months, and, on September 29, 1995, Johnson married William Hayward McIntyre, Jr., while still legally married to McCullar. Therefore, McCullar filed a bigamy complaint and obtained an arrest warrant against Johnson. Johnson was arrested and subsequently indicted for bigamy by the Winston County grand jury.[2] McCullar had been listed as a witness on the arrest warrant against Johnson, and he testified before the grand jury during its proceedings. There was testimony McCullar was considered the prosecutor’s main witness in the bigamy case and, further, that without his testimony it would be extremely difficult to gain a conviction against Johnson for bigamy. It was during this time that Johnson attempted to enlist the help of Ronnie Webb and David Prescott to hurt or kill McCullar. On May 10, 1997, while still legally married to McCullar, Johnson married Tim Richards; Johnson insisted that they go to Gatlinburg, Tennessee, to be married. Richards knew nothing of Johnson’s pri- or marriage to McCullar. Shortly after their marriage, Johnson began prompting Richards to kill McCullar. On November 6, 1997, McCullar filed for a divorce and, as part of the divorce complaint, he sought custody of his child, Chad McIntyre, and requested a DNA paternity test. After McCullar had filed the bigamy charges against Johnson, he received a large legal settlement resulting from an automobile accident with a logging truck, wherein he had suffered serious injuries. Johnson had informed Richards of the settlement and had told him that, should McCullar die, the money would go to Chad or to her. In late November 1997, just following Thanksgiving, Johnson and Richards planned and carried out the shooting death of McCullar.”
120 So.Sd at 1105-06.
During Johnson’s capital-murder trial the trial court admitted evidence of her bigamy conviction and her prior bad acts, which included evidence of adulterous relationships in which she had attempted to solicit her partners to assault or to murder *1123 McCullar; evidence indicating that she had attempted to enlist her partners’ help in hurting McCullar through sympathy by claiming that McCullar had raped and beaten her; evidence indicating that she had taken or led her partners by McCul-lar’s home on numerous occasions hoping to prompt an altercation; and evidence that she had manipulated Richards in the hope of prompting an altercation with David Prescott, with whom she had previously had an affair. Johnson did not request a limiting instruction relating to this evidence.
In oral argument before the Court of Criminal Appeals, Johnson argued that the trial court had erred in admitting evidence of her bigamy conviction and of her prior bad acts. The State argued on appeal that evidence of Johnson’s bigamy conviction and of her prior bad acts was properly admitted because the conviction and the prior bad acts constituted the res gestae of the offense and such evidence was relevant to prove Johnson’s motive and intent to commit the offense.
The Court of Criminal Appeals held that evidence of Johnson’s bigamy conviction and her prior bad acts was admissible for limited purposes as exceptions to the general rule excluding such evidence. See Rule 404, Ala. R. Evid., and Charles W. Gamble, McElroy’s Alabama Evidence § 69.01(1) (5th ed.1996). The Court of Criminal Appeals explained that evidence of Johnson’s bigamy conviction was properly admitted as proof of motive and as a necessary element of the capital offense with which Johnson was charged, i.e., murder when the victim had testified as a witness in a criminal proceeding and the murder is related to the victim’s role as a witness, § 13A-5-40(a)(14), Ala.Code 1975. Johnson, supra. Additionally, the Court of Criminal Appeals stated that evidence of Johnson’s prior adulterous relationships and evidence indicating that she attempted to solicit her partners to assault or to murder McCullar, including evidence that she sought to enlist their support through sympathy and that she had steered the men by McCullar’s residence in an attempt to provoke an altercation, were “admissible as proof of the unbroken chain of events leading up to the homicide.” Johnson, 120 So.3d at 1109. The court also explained that evidence of Johnson’s prior adulterous relationships and her threats and prod-dings to enlist the aid of the men with whom she was having the relationships to kill McCullar was admissible because it “tended to explain and relate to the killing; those acts were a part of one continuous transaction wherein the murder became the culmination of all of the circumstances. While somewhat peripheral, those acts were all links in the chain of events culminating in the murder.” 120 So.3d at 1110. Finally, the Court of Criminal Appeals stated that evidence indicating that Johnson had prompted an altercation between Richards and Prescott was admissible because it tended to explain “the relationship between the coconspirators and illustrated the nature of Johnson’s conduct as a catalyst in the murder” and was “relevant to show [Johnson’s] state of mind, motive, and intent at the time of the offense.” 120 So.3d at 1112.
Having determined that the evidence regarding Johnson’s bigamy conviction and her prior bad acts was admissible, the Court of Criminal Appeals then considered whether Johnson was entitled to a limiting instruction as to that evidence. Although Johnson did not request a limiting instruction, she nevertheless argued to the Court of Criminal Appeals that she was entitled to a limiting instruction informing the jury that it could not consider the evidence as an indication of bad character or to show that she had criminal propensities. The State argued on appeal that no limiting *1124 instruction was required because the evidence of Johnson’s bigamy conviction and her prior bad acts was not admitted to impeach Johnson and, further, because no limiting instruction is required when the evidence of the prior bad acts or a prior conviction establishes intrinsic facts of the present offense rather than collateral matters. Because no objection had been made on this basis at trial, the Court of Criminal Appeals conducted a plain-error review of the issue. Rule 45A, Ala. R.App. P.
The Court of Criminal Appeals undertook a detailed discussion of this Court’s decisions in Ex parte Minor, 780 So.2d 796 (Ala.2000), and Snyder v. State, 893 So.2d 482 (Ala.2001), and, concluding that Johnson was entitled to a limiting instruction regarding the evidence of her prior bad acts, reversed Johnson’s conviction. The Court of Criminal Appeals specifically stated:
“In the present case, the trial court gave no limiting instructions concerning the use of the evidence of Johnson’s prior bad acts to the jury. The jury was neither informed as to what limited purposes the evidence could be considered [for] nor informed as to what purposes the evidence could not be considered [for]. After hearing and seeing all of the evidence of Johnson’s sexual relationships and manipulations, it is highly probable that the jury could have used that information to determine that Johnson was of bad character and poor morality. Because in this case the jury may have, without having been instructed otherwise, based its conviction on its belief that Johnson is a person of bad character, we cannot say that Johnson received a fair trial. Because we find plain ei'ror in the absence of limiting instructions informing the jury of the proper purposes for which the evidence could be considered or the purposes for which that evidence could not be considered, the judgment of the trial court is due to be reversed and the cause remanded for a new trial.”
Johnson, 120 So.3d at 1119. Thus, the basis of the Court of Criminal Appeals’ holding was that the trial court had erred in not sua sponte giving a limiting instruction on the use by the jury of evidence of Johnson’s prior bad acts, i.e., evidence of her “sexual relationships and manipulations,” and not that the trial court had erred in failing to give such an instruction as to evidence of her bigamy conviction. 120 So.3d at 1119.
This Court granted certiorari review to address the State’s contention that the decision of the Court of Criminal Appeals is in contravention of this Court’s holdings in Ex parte Minor and Snyder and to determine whether the Court of Criminal Appeals erred in finding plain error in the trial court’s failure to sua sponte give a limiting instruction to the jury regarding the evidence of Johnson’s prior bad acts.

Standard of Review

Rule 105, Ala. R. Evid., provides: “When evidence which is admissible ... for one purpose but not admissible ... for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.” The Court of Criminal Appeals properly concluded that the evidence of Johnson’s prior bad acts was admissible for the reasons explained earlier in this opinion; the admissibility of that evidence is not under review here. However, as mentioned above, Johnson did not request a limiting instruction relating to the evidence of her prior bad acts, and the trial court did not give a limiting instruction as to that evidence. We note that Rule 39(a)(2)(D), Ala. R.App. P., allows this Court, when reviewing a death-penalty case, to address “any plain error or defect *1125 in the proceeding under review, whether or not brought to the attention of the trial court ... and to take appropriate appellate action ... whenever such error has or probably has adversely affected the substantial rights of the petitioner.” Because the death penalty has been imposed in this case, this Court will notice any “plain error,” regardless of whether an objection was made before the trial court. Ex parte Land, 678 So.2d 224 (Ala.1996). Plain error arises when the claimed error seriously affects the defendant’s substantial rights and has an unfair prejudicial impact on the jury’s deliberations. Ex parte Martin, 931 So.2d 759 (Ala.2004).

Discussion

In Ex parte Minor, the defendant, Minor, was convicted of the capital murder of an infant who died as the result of shaken-baby syndrome. Minor testified on direct examination that he had prior convictions for assault in the second degree, possession of cocaine, and for rape in the second degree. On cross-examination the State drew increased attention to the prior convictions by delving into the details of those convictions in an attempt to demonstrate “that Minor failed to take responsibility for his actions.” Ex parte Minor, 780 So.2d at 804.[3] Minor did not request a limiting instruction as to the proper scope of the jury’s consideration of that evidence. Additionally, the trial court gave only a vague instruction regarding the use of impeachment evidence and failed to instruct the jury that the evidence of the prior convictions could not be considered as substantive evidence that Minor committed the capital offense with which he was then charged. This Court framed the issue presented as “whether, absent a request or an objection by the defendant, the trial court has a duty to instruct the jury that evidence of prior convictions is not to be considered as substantive evidence of guilt.” Ex parte Minor, 780 So.2d at 800. In holding that the trial court “does have such a duty in a capital-murder case” this Court stated:
“[ T]his Court has acknowledged the inherently prejudicial nature of evidence of a defendant’s prior convictions. Cofer v. State, 440 So.2d 1121, 1124 (Ala.1983) (‘[ejvidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant’). ‘The general exclusionary rule bars the state from introducing evidence of an accused’s pri- or criminal acts for the sole purpose of proving the propensity of the accused to commit the charged offense.’ Hobbs v. State, 669 So.2d 1030, 1032 (Ala.Crim.App.1995). Thus, evidence of prior convictions is admissible only for limited purposes. ‘The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ Cofer, 440 So.2d at 1123 (quoting Charles W. Gamble, McElroy’s Alabama Evidence § 69.01 (3d ed.1977)). The general exclusionary rule ‘protects the defendant’s right to a fair trial’ by seeking ‘to prevent conviction based on a jury belief that [the] accused is a person of bad character. The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.’ Cofer, 440 So.2d at 1123 (citation omitted). Thus, it naturally follows that the trial court should take all neces *1126 sary precautions to ensure that when evidence of a defendant’s prior convictions is admitted into evidence, the jury is properly instructed on the purpose for which it may consider that evidence. This includes instructing the jury, sua sponte, that it may not consider the evidence of prior convictions as substantive evidence that the defendant committed the charged offense.
[[Image here]]
“... The trial court did not tell the jury that the evidence of Minor’s prior convictions could not be considered as substantive evidence that he committed the crime charged. Because the jurors were not so instructed, they were free to consider the prior convictions for any purpose; thus, they could consider the probability that Minor committed the crime because he had demonstrated a prior criminal tendency. Allowing the jury to make such use of the evidence was highly prejudicial and constitutes reversible error. See Randolph v. State, 348 So.2d 858 (Ala.Crim.App.1977) (conviction reversed because the trial court failed to adequately distinguish between impeachment evidence and substantive evidence).
“The failure to instruct a jury in a capital-murder case as to the proper use of evidence of prior convictions is error, and that error meets the definition of ‘plain error.’ That failure is ‘so obvious that [an appellate court’s] failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ Womack, 435 So.2d at 769.... Consid-ering the presumptively prejudicial nature of evidence of a defendant’s prior convictions, we consider it incumbent on the trial court to ensure that the jury was instructed on the proper use of such evidence. We conclude that the failure of the trial court to instruct the jury that it could not use such evidence as substantive evidence of guilt ‘has or probably has’ substantially prejudiced Minor; thus, it satisfies the plain-error standard. See Rule 39(a)(2)(D) and (k), Ala. R.App. P.”
Ex parte Minor, 780 So.2d at 802-04.
In Snyder, the defendant, Snyder, was convicted of three counts of capital murder. On direct examination Snyder testified that he had previously pleaded guilty to second-degree theft of property. During cross-examination by the State, the prosecutor briefly alluded to the earlier conviction without further questioning Snyder regarding the conviction. Although the trial court instructed the jury that it could consider evidence of Snyder’s prior conviction in determining what credibility to give his testimony, the Court of Criminal Appeals nevertheless concluded that plain error had occurred because the trial court had failed to specifically instruct the jury that it could not consider Snyder’s prior conviction as substantive evidence that he had committed the crimes with which he was charged.
This Court in Snyder framed the issue on appeal as whether the trial court erred “by not specifically instructing the jury that it could not use prior-conviction evidence as ‘substantive evidence of guilt.’ ” Snyder, 893 So.2d at 486. This Court in Snyder limited the holding of Ex parte Minor by stating that although the Court in Ex parte Minor found “plain error in the trial court’s failure to instruct the jury on the purpose of the evidence of Minor’s prior conviction, the Court’s holding in that regard did not establish a per se rule” regarding such evidence and that “each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis.” Snyder, 893 So.2d at 485. *1127 This Court distinguished the facts in Snyder from those in Ex parte Minor, noting that in Ex parte Minor the prosecutor emphasized the prior-conviction evidence to the jury, whereas in Snyder the prosecutor only briefly alluded to the prior conviction on cross-examination and did not emphasize it during his closing argument, thus prompting this Court to conclude that “unlike the evidence in Ex parte Minor, the evidence of Snyder’s prior conviction was presumptively prejudicial, but its impact was not egregious.” Snyder, 893 So.2d at 485. Further distinguishing Snyder from Ex parte Minor, this Court noted that the trial court in Snyder gave the jury the standard charge on its proper use of the evidence relating to the prior conviction, whereas in Ex parte Minor the trial court gave the jury no direction as to the purpose of the prior-conviction evidence. In reversing the judgment of the Court of Criminal Appeals, this Court specifically stated:
“Here, the trial court properly instructed the jury as to the purpose of the evidence of Snyder’s prior conviction. If an instruction clearly informs the jury of the sole purpose of prior-conviction evidence — the witness’s credibility — it is reasonable to assume that the jury would not use the evidence for any other purpose. See, e.g., Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (recognizing that jurors are presumed to follow instructions). Unlike the circumstances in Ex parte Minor, where the jury could have used the testimony for whatever purpose it desired — to determine a witness’s credibility or as substantive evidence of the defendant’s guilt — the trial court in this case informed the jury that the prior-conviction evidence had ‘one purpose’ and that that purpose was to determine credibility; consequently, it eradicated the necessity of informing the jury that it would be improper to use the evidence as substantive evidence of guilt. The unambiguous instruction adequately cautioned the jury, explicitly stated the sole purpose of the testimony, and eliminated the risk that the evidence would be used improperly. Therefore, the emphasis in the instruction on the one purpose of the evidence overcomes a finding that the alleged error ‘has or probably has adversely affected the substantial right of [Snyder].’ Rule 45A, Ala. R.App. P. To hold that the trial court is required to inform the jury that prior-conviction evidence cannot be used as substantive evidence, would unnecessarily limit the trial court’s discretion in forming jury instructions, would restrict defense counsel’s trial strategy, cf. United States v. Barnes, 586 F.2d 1052, 1059 (5th Cir.1978), and in certain circumstances may unnecessarily emphasize the prejudicial evidence. Therefore, while the instruction to the jury must state either that prior-conviction evidence can be used only for the purpose of assessing a witness’s credibility or state that such evidence may not be used as substantive evidence of the defendant’s guilt of the crime charged, it is not reversible error per se if the trial court does not instruct both as to the admissible purpose of the prior-conviction evidence and the purpose for which such evidence may not be considered, unless counsel requests such a two-pronged instruction and the instruction is supported by the evidence.”
Snyder, 893 So.2d at 486-87.
In Ex parte Martin, supra, the defendant, Martin, was convicted of the capital murder of his wife. The State offered, over a hearsay objection from Martin, the testimony of a friend of the victim. The victim’s friend testified that the victim had *1128 told her a few days before the victim’s death that if she did not hear from her in three or four days the friend was to contact the victim’s parents and tell them that “he did it.” The friend also stated that in the same conversation the victim told her that the “[defendant] might not do it, [he] loves me.” 931 So.2d at 763. This Court concluded that the friend’s testimony was properly admitted because it was probative of the victim’s state of mind and was relevant to rebut the defendant’s trial theory that the victim had committed suicide. Ex parte Martin, supra.
In addressing in Martin the issue whether plain error had occurred in the trial court’s failure to sua sponte give a limiting instruction regarding the testimony of the victim’s friend, this Court emphasized that the holdings of Ex parte Minor and Snyder requiring a sua sponte limiting instruction were limited to only those instances where evidence of prior convictions are offered for impeachment purposes. This Court specifically stated:
“In Ex parte Minor, 780 So.2d 796 (Ala.2000), we held that it was plain error for the trial court to fail to give, sua sponte, limiting instructions to the jury regarding its use of evidence of the defendant’s prior convictions. The defendant had not objected to the evidence and had not requested an instruction that the evidence was to be used solely for impeachment purposes and not as evidence of guilt. In finding plain error, we recognized the ‘presumptively prejudicial nature of evidence of a defendant’s prior convictions.’ 780 So.2d at 804. In the instant case, we are not dealing with evidence of prior convictions and their corresponding ‘presumptively prejudicial nature.’ In any event, in Snyder v. State, 893 So.2d 482, 485 (Ala.2001), we limited the holding of Minor, stating, ‘each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis.’ ”
Ex parte Martin, 931 So.2d at 768. Although the Court recognized that the holdings in Ex parte Minor and Snyder were limited to situations in which evidence of prior convictions were offered for impeachment purposes, the Court went on to conclude that based on the circumstances of that case, including the fact that the evidence in question was admissible for a limited purpose, the trial court’s failure to sua sponte give a limiting instruction regarding the proper use of the evidence did not constitute plain error. 931 So.2d at 769.
The Court of Criminal Appeals itself has recognized the limited holding of Ex parte Minor. In Key v. State, 891 So.2d 353 (Ala.Crim.App.2002), the defendant, Key, was convicted of the capital murder of his ex-wife. The State offered evidence during the penalty phase of the trial indicating that on the day before he killed his ex-wife Key had pleaded guilty to aggravated stalking as to his ex-wife and had been sentenced to 10 years’ imprisonment. The Court of Criminal Appeals held that the evidence of the stalking conviction was properly admitted to show motive for the murder. Key argued that plain error occurred when the trial court failed to give the jury a limiting charge regarding the evidence of the stalking conviction. The Court stated:
“Key argues that plain error occurred because the trial court failed to sua sponte charge the jury that evidence of his prior conviction could be considered for impeachment purposes only. Key relies on Ex parte Minor, 780 So.2d 796 (Ala.2000). The State contends that Ex parte Minor is distinguishable, because Key did not testify and because the evi- *1129 denee of his prior conviction was not offered for impeachment purposes. Rather, the State argues, the evidence was offered as proof of his motive to murder his ex-wife. The State’s analysis is correct. In Ex parte Minor, the Alabama Supreme Court held that plain error occurred when the trial court failed to instruct the jury that evidence of Minor’s prior conviction was admitted only for purposes of impeachment. As the State correctly argues, the evidence here was not offered to impeach Key as was the case in Ex parte Minor. ”
Key, 891 So.2d at 366-67.
The Court of Criminal Appeals’ holding here that plain error occurred in the absence of a limiting instruction to the jury as to the proper use of the evidence regarding Johnson’s bad acts, i.e., her adulterous relationships, sexual manipulations, and proddings, conflicts with this Court’s decisions in Ex parte Minor and Snyder.
A fundamental difference exists between the evidence of prior convictions offered in Ex parte Minor and Snyder and the evidence of Johnson’s bigamy conviction and prior bad acts offered in this case. In Ex parte Minor and Snyder evidence of the defendants’ prior convictions were offered for the purpose of impeaching the defendant’s credibility. This Court noted the “inherently prejudicial nature” of such evidence and the “irreversible impact [of such evidence] upon the minds of the jurors” and recognized the need for a limiting instruction telling the jury that it may not consider evidence of the defendants’ prior convictions “as substantive evidence that the defendant committed the charged offense.” Ex parte Minor, 780 So.2d at 802.
The evidence of Johnson’s bigamy conviction and her prior bad acts were offered, not as impeachment evidence, but as substantive evidence of the crime with which she was charged. As discussed above, the bigamy conviction was offered as proof of motive and as an element of the capital offense with which she was charged — i.e., murder of a witness who had testified against her. Evidence of Johnson’s prior bad acts, i.e., her adulterous relationships, sexual manipulations, threats, and proddings in order to enlist a male counterpart to assault or to murder McCullar, was offered to prove an unbroken chain of events or a single transaction that culminated in the murder of McCul-lar. The evidence indicating that Johnson had prompted an altercation between Richards and Prescott was necessary to explain the conspiracy between Johnson and Richards to murder McCullar and was relevant to show Johnson’s state of mind, motive, and intent at the time of the offense. The Court of Criminal Appeals noted in its opinion that not only was this evidence necessary to prove the State’s case, it was “highly necessary” to the State’s case. Johnson, 120 So.3d at 1113.
It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense. Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged. See People v. Coney, 98 P.3d 930 (Colo.Ct.App.2004) (holding that evidence of other offenses or acts that are part and parcel of the charged offense is admissible as res gestae and may be admitted without a limiting instruction); State v. Long, 173 N.J. 138, 171, 801 A.2d *1130 221, 242 (2002) (evidence of the defendant’s actions “served to paint a complete picture of the relevant criminal transaction” and therefore was admissible, and a limiting instruction was unnecessary because the evidence was admitted under the res ges-tae exception); and Camacho v. State, 864 S.W.2d 524, 535 (Tex.Crim.App.1993) (holding the evidence of the extraneous offenses showed the context in which the criminal act occurred, i.e., the res gestae, and was therefore admissible and not subject to the requirement of a limiting instruction).
Accordingly, we conclude that the trial court did not commit plain error in failing to give the jury a limiting instruction regarding its use of the evidence relating to Johnson’s prior bigamy conviction and her prior bad acts, including her adulterous relationships, sexual manipulations, and proddings, because that evidence, as discussed above, was properly admitted as substantive evidence of the offense with which Johnson was charged and was not offered for purposes of impeachment. Therefore, the judgment of the Court of Criminal Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and LYONS, HARWOOD, WOODALL, STUART, SMITH, and PARKER, JJ., concur.
SEE, J., concurs in the result.

1. Johnson was charged and convicted of murdering McCullar by shooting him, or causing him to be shot by aiding and abetting Richards. Richards ultimately entered into a guilty-plea agreement with the State and later testified against Johnson at trial.

2. Johnson ultimately pleaded guilty to the bigamy charge.

. This Court concluded that the evidence of Minor's prior convictions, although elicited by defense counsel on direct examination, was to be treated as if offered for impeachment purposes.